Our fourth case for this morning is Kallal v. CIBA Vision Corporation. Mr. Barnes. My name is Timothy Barnes. I represent the plaintiff in this case. Thank you on behalf of the plaintiffs and my colleagues for all of your time here today. May it please the Court. The district court erred when it denied Stephen Kallal a jury trial when Stephen Kallal has presented evidence sufficient to raise an issue of material fact. But what evidence is there that his minus 3.75 diopter contact lenses were part of the defective lots that were recalled? I thought nothing of that size was sent to Rose Optical, and he has no allegation he bought lenses anywhere else. There is circumstantial evidence, Your Honor, suggesting that the lenses he purchased were defectively manufactured. But I don't see what it, I mean, I thought that you focused, you can tell me if this is wrong, but I really can't find it in the record. I thought that your focus was that CIBA had been told that there was this production defect, this ion permeability problem. And they recall 11 million contact lenses in early 2007. And your complaint asserts that one of those defective lenses that were covered by the recall boxes were purchased by your client. And you can show, you can get them to Indonesia, but they have, but CIBA introduced evidence of lots, manufacturing lots, and none of the lots that were defective were purchased by Mr. Kalal because it was not the right diopter. Respectfully, Your Honor, I do not believe the plaintiff is limited to a case where we need to show that the lenses were recalled or subject to the recall, only that they were defectively manufactured. When did that first, that point first enter the case? I found it very, for the longest time you seem to be talking about it being the lenses that were recalled, and then all of a sudden we're talking about, well, it may not have been one of the recall lenses, but it was still a bad lens. And the record on document 12-2, page ID 355, paragraph 26, it's the plaintiff's second amended complaint. So that's, what paragraph of the second amended complaint in particular? 26, Your Honor. All right, I'm looking at paragraph 26. It asserts that the plaintiff's case is based upon the defective manufacture, not the defective resign or not the defective recall of the contact lenses. Further, inferences in summary judgment are drawn in favor of the non-moving party. But that's where I thought that the court was trying to get you to focus on, you know, what evidence do you propose to introduce that if believed by a trier of fact would show that there was negligent infringement? You've got this giant recall, and had the lenses been part of the recalled ones, then maybe you'd say, that's my evidence. But you don't have that. You're just guessing. Human experiences and inferences suggest that the recall may have been over or under-inclusive. In this case, under-inclusive. Under-inclusive, no, I know. But on the other hand, you know, Mr. Kalal had had trouble with other contact lenses, too. I mean, I don't know why, just because he wears these lenses, he has some trouble. Two years later, he goes to see an ophthalmologist, and that person says, gee, maybe it was some lenses you wore two years ago. Why that's thin? Stephen's problems with his lenses did not begin two years after he wore those lenses. He began experiencing irritation a week after he wore those lenses. And it is only when his injuries became far more severe that he needed to seek treatment from Dr. Pathak, who's a renowned expert in that field. Does the record show when he stopped wearing these? And you would think he'd stop wearing lenses that were hurting your eyes. He did stop wearing them approximately one week after he began wearing them. However, for sporting events, he would occasionally use them. And when did he seek medical help? He sought medical help shortly after he began using those lenses. At first, that medical help was through his mother, and he asked his mother, who's a nurse, what he should do in that situation. Yes, and besides that, what other medical help? Besides that, his injuries had not become severe enough yet where he sought more extensive medical help. So what's in the record about that? I mean, I thought that you were really stressing the visit to Dr. Pathak, which isn't until significantly later. Regardless of when his visit to Dr. Pathak? Is that right? I mean, you can correct me if I'm wrong. When does the record show that he first goes to Dr. Pathak? My understanding is that it is approximately two years after he began wearing those lenses. Okay, that's what I thought. However, Dr. Pathak did testify that the likely cause of his injuries was a defectively manufactured pair of contact lenses. And this testimony remains unrebutted by any other witness presented or any other piece of evidence presented. There is no expert testimony. But there was evidence that Kahlal suffered eye irritation even before he began wearing these lenses, right? Yes, but his eye irritation became greatly exacerbated after wearing those lenses. He suffered four years of painful treatments, including steroidal treatments, which may have caused his own blindness or it could have caused severe glaucoma. So there was a mental aspect to his suffering as well. The ophthalmologist's assessment that his condition is consistent with oxygen deprivation to his eyes, secondary to contact use, if he had this problem prior to using these contacts, how could that be distinguished from an effect of using these lenses? The effect of using these lenses was a punctuate corneal erosion, a tear on the surface of his eye. And a tear on the surface of the eye could result from the use. Does the ophthalmologist link it to these lenses as opposed to what he used prior to these lenses? Yes, Your Honor. I don't see that. I'm trying to find that. There's an exchange where there's a hypothetical. It looks like a hypothetical to me. If it were established to your reasonable satisfaction that ion permeability is directly linked to oxygen permeability, is it your opinion the condition was more probably not caused by the contact lenses with deficient oxygen permeability? That's, of course, the flaw that caused the recall. And Dr. Pathak says, I think what Dr. Pathak is trying to say is the condition is likely due to the contact lens use. But I don't see where it says one kind of contact lens versus another. The contact lens that Dr. Pathak was being questioned about throughout that deposition were the contact lenses used by the plaintiff that are the subject of this complaint. That questioning was done by plaintiff's counsel, so I think it may be reasonably inferred that those lenses are the ones that are the subject of this complaint. These are the only lenses he wore before seeing that doctor? No. He wore contact lenses prior to the events alleged in the complaint, Your Honor. Another type or another brand? Yes. And had eye irritation prior to wearing the lenses that are subject to this case? Yes, but not to this extent, Your Honor.  This was a very severe trauma to his eyes. Mr. Barnes, I have some difficulty following the argument you made in your brief with respect to the alleged infirmities in the district court's handling of discovery. Perhaps you could spend a few minutes talking about that. In discovery, discovery was set for only six months starting in October of 2011. This was due to extensive litigation on the pleadings in this case, which are very present. Because this looks like it's a 2009 case. Yes, Your Honor. So there's back and forth on the pleadings for two years and then a case management schedule? Yes, Your Honor. Nominal extensions of discovery allowed for a grand total of 10 months of discovery in this case. This is a complex product liability matter involving concepts such as ion permeability, oxygen permeability, and other material characteristics of a contact lens. This case is being run on the plaintiff's side by a sole practitioner. So the cutoff of discovery did not allow the plaintiff as much time as was perhaps optimal for the plaintiff to discover additional facts. However, the plaintiff has had enough time to discover facts that may preclude the district court from issuing summary judgment in favor of the defendant because they raise an issue of material fact as to causation. But the district court got very frustrated. There are times in the record where there's an extension of time given and not so much as a notice of a deposition gets mailed out, never mind actually completing the deposition. I think the judge at some point was entitled to say this is the deadline. I mean, judges have to do that. They'd never get cases off their dockets. Your Honor, this is merely the result of the limitations of a small law firm, and this is a very small amount of time for a case of this complexity. That is the argument in its simplicity. All right. Anything further? Do you want to save a little bit of rebuttal time? I'd like to continue a little bit. The defendant's assertions need to be tested. The defendant's business records have never been tested via cross-examination. They've never been further tested via discovery, and they're the only records present in this case that have been considered conclusive by the district court. And I'll save some time for rebuttal. Thank you, Your Honor. All right. Thank you very much. Mr. Lasker. Thank you, Your Honors, and may it please the Court. My name is Eric Lasker on behalf of SEBA Vision. My comments today will be brief. The plaintiff proceeded in this case with respect to a specific claim of manufacturing defect related to ion permeability. As Your Honor has recognized and has set forth in the record of the motions hearing, which is appended to the appellant's opening brief at A5 to A6, the appellant's theory was that Mr. Klaw used recalled contact lenses and that his lenses were actually part of the lots that were subject to the recall. But where does he say that? I'm looking at this paragraph 26. Your Honor. I'm very interested in when the link between manufacturing defect, which could be a bigger problem than the number of ones that SEBA Vision recalled, and the recall comes in. At what point does he concede that if they weren't in the recall, then there's no case? Your Honor, the place in the record where you can find this is the motions hearing prior to the complaint where the district court is asking counsel what his theory is as far as the defect, and that is, as I mentioned, at pages A5 to A6 in the appendix, which is attached to the appellant's opening brief, where the court asks plaintiff's counsel what his theory is, and the plaintiff's counsel says there's a recall, and the court states questions, were your client's contact lenses within those lots at A6? And the plaintiff's counsel says, I believe so, Your Honor. Now, also, Your Honor, it's important to recognize that the recall. And she says, actually, I'm looking at this. That's where she said, you know, he's talking about this recall. And then the judge says, were your client's contact lenses within those lots? And he replies, I believe so. And she says, the reason I'm asking is none of that's in the record before me. And he points out it's the pleading stage fine. So after that is when the Second Amendment complaint comes in? Correct, Your Honor. But even the Second Amendment complaint doesn't seem to say that the lenses that he got were recalled. Your Honor, I agree that the complaint is vague in its allegations on that, but the fact is that that is the only evidence that plaintiff's counsel has, plaintiff has submitted in this case, of any manufacturing defect at all. His claim is vague. Other than just some kind of raised IPSA, you know, they hurt my eyes. They must have been bad. Correct, which under Illinois laws is obviously not sufficient. Plaintiff's theory is ion permeability. He hasn't raised any other potential defect. That is the recall. And it is clearly established in the record his lenses were not part of that recall. And he simply does not have any other evidence of any defect that he can point to. It's just a court correctly recognized. And that's the basis for summary judgment. So the record actually shows SEBA collected all of its records as to which manufacturing lots were included in the recall? Yes, Your Honor. And, in fact, there were two different production platforms. So there was a two-for-one platform and an ATS platform. The names aren't particularly important. The problem was only found on one of the production platforms. There was extensive testing to identify which lots were subject to this ion permeability problem. That was submitted to the FDA. There's a series of correspondence back and forth with the FDA, where the FDA approves the recall. And there is simply no evidence anywhere that Mr. Kalal used any of the recalled lots. And, in fact, given all the testing for all the other lots that showed there was no ion permeability problem, there's no basis even to speculate or infer that he would have used contact lenses that had this problem. So when you say two platforms, you're describing actually two methods of manufacturing a particular kind of contact lens. Yes, and the history is what happened in the summer of 2006 is that there were certain changes to one of those platforms. And it was thereafter that they discovered this problem. They went back and tested all the lots over a period of time to make sure they captured the time period where there was any problem with ion permeability. They determined actually there was only about 7 to 10 percent of the contact lenses, even in those lots that had an ion permeability problem, that would be below 0.6. But they recalled all the lots and even lots potentially that weren't covered just to make sure they had everything captured. And the other lots would not have been affected by this problem. As Your Honors correctly recognize with Dr. Parthak, she did not see the plaintiff for two years after he ceased using the contact lenses. The plaintiff used the contact lenses for about five months. After he first experienced a problem, he testified in his deposition, and this was at R-12-9-10-75, that he'd had similar problems with contact lenses before. And so he simply went to his mother, and his mother decided to self-medicate. She'd had some old antibiotic medication from surgery, so she had some five bottles just sort of in her bathroom cabinet, and she just gave him those to try, and he tried that for a period of five months. Then he went back to his ophthalmologist, was given another medication, then continued to use different types of contact lenses for two years before he met with Dr. Parthak. And Dr. Parthak was very clear in her testimony. She had no evidence. She didn't know if he'd used recalled contact lenses. She didn't know anything about ion permeability. She answered a hypothetical question. That seems very odd to me, by the way, that an ophthalmologist wouldn't know anything about ion permeability of contact lenses. Well, Your Honor, ion permeability, frankly, is not an issue that a doctor would necessarily care about. Ion permeability is part of something you can measure, but it really doesn't have a major effect.  Precisely. I mean, so if you're a specialist in eyes, you're going to want to know about movement on the eye and how much oxygen gets to the eye through the lens. You'll want to know a lot of those things. Well, the issue, I mean, this is not before Your Honors, but the issue of whether ion permeability has anything to do with oxygen permeability is not a settled fact, and we would dispute that it is. We also monitor oxygen permeability. Those are two different measures. And the medical assessment that was done in connection with the recall, and they had an outside medical expert conduct a clinical trial to determine the impact of this, they found very minor effects. There's not been any evidence, and there was reporting to the FDA going on for months, of any serious adverse event that took place here. It was a voluntary recall because there was a measure that was off. But the types of even minor effects are found in a very small proportion of individuals who use these lenses. It was nothing different than sort of the ordinary dust in a contact lens that happens in spermage, unfortunately, to our contact lenses all too frequently. So this is not something that I would expect to be in a doctor's mind. It's just not a serious enough issue.  If there's nothing further, thank you, Your Honors. Evidently not. Thank you very much. Anything further, Mr. Barnes? Your Honor, the temporal nexus in this case between the purchase of the contact lenses, the recall of the contact lenses occurring at almost exactly the same time, and the fact that these contact lenses were manufactured in the same location as defective contact lenses, and the fact that the FDA noted, or the FDA recaller Arnold Best noted, that new users of these contact lenses might not notice the serious irritation caused by these lenses and continue to wear them despite a risk of injury, all show that these lenses may have caused this injury. It's a strong evidentiary predicate that demonstrates that these lenses could have caused that injury. Does the record show that this Indonesian facility has both kinds of factories or just one kind of these platforms that Mr. Lasker was talking about? I cannot comment upon it, Your Honor. The same injuries that would be expected from low ion permeability, rips and tears in the surface of the eye, were caused by these lenses. It's clear from the medical records. I'd like to make a correction, actually, on the medical records of the plaintiff, Stephen. He sought treatment after his injuries. However, he never was able to successfully find a doctor who could treat his injuries because they were unique and extensive until he found Dr. Pathak. That's in Mrs. Kalal's deposition, or his mother's deposition. Often, the plaintiff, because of his injuries, could not wear contact lenses at all, and he did not do so for several years after the accident. The Schaefer deposition indicates and instructs the record that only about half of the recalled lenses were successfully recalled, that approximately 50% of those lenses remained in the marketplace even after their recall. This is a case where the defense's evidence has not been tested. It has not been placed before a jury, and yet it has been presumed to be correct despite the evidentiary standard where the plaintiff is afforded review in a light most favorable to him and review of inferences in a light most favorable to him. This is a case where the plaintiff has suffered for approximately four years, suffering painful treatments that he would often tremor during as drops were applied to his eyes. And this is a case that should go to a jury so that the plaintiff has an opportunity to present these issues. Thank you, Your Honor. All right. Thank you very much, Mr. Barnes. Thanks to both counsel. We'll take the case under advisement.